UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAROUN FAWAZ, Individually and TEN
MILE AND GRATIOT SUNOCO, INC.,
a Michigan corporation,

    Plaintiffs,                                 Case No. 05-73135

v.                                                   Honorable Patrick J. Duggan

BUSINESS LOAN EXPRESS, LLC and
BUSINESS LOAN CENTER, LLC,

    Defendants.
_____/

## OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan on June 26, 2006.

PRESENT:        THE HONORABLE PATRICK J. DUGGAN
                         U.S. DISTRICT COURT JUDGE

On July 12, 2005, Plaintiffs filed a seven-count complaint in the Macomb County state court against Defendants arising out of the denial of a loan. In their Complaint, Plaintiffs assert claims for: (I) Promissory Estoppel; (II) Unconscionable Contract of Adhesion; (III) Innocent Misrepresentation; (IV) Breach of Contract–Implied Duty of Good Faith; (V) Breach of Contract–Implied Duty of Fair Dealing; (VI) Breach of Express Contract; and (VII) Negligence. On August 12, 2005, Defendants removed the action to this Court on the basis of diversity jurisdiction. Presently before the Court is

Defendants' Motion for Summary Judgment, filed on April 3, 2006. The Court held a hearing on the Motion on June 15, 2006.

**I.  Background**

Plaintiff Maroun Fawaz is a Sunoco dealer who had operated a Sunoco Station at 10 Mile and Gratiot (the "Station") since 1991. In 2003, Sunoco offered to sell Fawaz the Station for $650,000. Fawaz accepted the offer on July 8, 2003. (Pl.'s Resp. Ex. 1).

Fawaz applied for a loan with First State Bank and signed a commitment letter on July 28, 2003. (Pl.'s Resp. Ex. 4). In mid-September First State Bank rejected the loan due to an underground leak at the Station. (Fawaz Dep. at 48).

After learning that the loan had been rejected, Sunoco's real estate consultant, NRC, contacted Business Loan Express (BLX). A salesman at BLX, Brian Fitzgerald, contacted Fawaz to discuss the possibility of extending Fawaz a loan. According to Fawaz, at that meeting, he told Fitzgerald that he had been rejected by First State Bank due to an underground leak at the Station. (Fawaz Dep. at 58). According to Fawaz, "[Fitzgerald] said that should be no problem. We deal with Sunoco all the time, and we know about all this stuff. He said it shouldn't be a problem at all." (*Id.*). Fitzgerald understood that Sunoco was expecting a commitment within a certain time frame and that Fawaz needed a commitment letter quickly. (Fitzgerald Dep. at 43-44).

On October 2, 2003, Fitzgerald hand delivered a commitment letter to Fawaz for a guaranteed loan in the amount of $600,000, at an interest rate of prime plus 2.75% for the purchase of the Station. Fawaz contends that when Fitzgerald gave him the commitment letter, Fitzgerald stated, "this is it, we're all set, we're all done." (Fawaz Dep. at 112-13).

2

The commitment letter provided that the loan was "subject to the following terms, conditions, and the issuance of a $400,000 guaranty by the United States Small Business Administration (SBA): . . ." (Pl.'s Resp. Ex. 8, Commitment Letter at 1). Among the six pages of terms and conditions that followed, the commitment letter required the borrower to put down a $10,000 third party deposit (*id.* at 5), and required the following environmental assessment:

> A Phase I Environmental Site Assessment conducted by a licensed environmental firm, acceptable to BLX in its sole discretion, on [the Station]. If, after reviewing this environmental assessment, it is determined to be necessary, a Phase I or Phase II Environmental Site Assessment will be required on the affected property, including its historical use(s), and a review of existing regulator compliance.

(*Id.* at 3).[1]

The commitment letter also provided the following merger and integration clause:

> The commitment letter dated, October 2, 2003, sets forth the entire agreement and understanding of the parties with respect to the Loan and supercedes all prior agreements written or oral with respect therein. Thereafter, this commitment together with the SBA Authorization and Loan Agreement and the other documents executed at the closing or required therein shall set forth the entire agreement and understanding of the parties with respect to the Loan. Borrower(s) understands and acknowledges that it may not rely upon any statements or representations made by any party in connection with the Loan unless they are contained in this commitment or in a subsequent writing signed by a duly authorized officer of BLX.

(*Id.* at 6).

---

[1] In addition, a BLX loan checklist provided:
A phase I environmental site assessment will be required prior to closing on all commercial properties. Note: should the results of this audit indicate the need for further investigation, a phase I/II audit will be required. Any recommendations contained in the phase I/II audits will be added to the requirements to be completed prior to closing.
(Pl.'s Resp. Ex. 9).

3

In addition, the commitment letter provided: "BLX in its sole discretion reserves the right to withdraw this commitment if during the course of its due diligence process it uncovers information that adversely affects the basis upon which this commitment was issued." (*Id.* at 4).

On October 6, 2003, both Fawaz and his wife signed the commitment letter. (*Id.* at 7). With the commitment letter, Fawaz submitted the $10,000 third party deposit to BLX. (*Id.* at 8).

BLX retained PM Environmental (PME), an environmental appraiser firm, to perform an investigation of the Station. In the Phase I assessment, PME determined that there was an open leaking underground storage tank (L.U.S.T.). The quote for the Phase II assessment stated:

> This phase II ESA will address the recognized environmental concerns (RECs) identified by PME during completion of the Phase I ESA in September, 2003. . . . . These RECs include: . . . pinhole filter leak identified in 1991 in western dispenser . . .

(Pl.'s Resp. Ex. 10, PME quote dated October 31, 2003).

On October 31, 2003, BLX received the SBA authorization approving the guarantee of $400,000. (Pl.'s Resp. Ex. 12, SBA Authorization at 1). The SBA authorization was subject to environmental requirements, which provided, in pertinent part:

> Lender must submit the results of the Environmental Investigation to the SBA office listed above for SBA approval prior to disbursement. If Lender or SBA determines from the Environmental Investigation that there is potential environmental contamination, Lender may not disburse the Loan until SBA is satisfied that the risk has been sufficiently minimized. Adverse environmental findings may lead to cancellation of the SBA guarantee.

(*Id.* at 7).

4

Although Sunoco had previously signed an indemnification form, indemnifying Plaintiff from environmental liability in certain circumstances (Pls.' Resp. Ex. 2), this indemnity form did not indemnify Defendant or the SBA.  Thus, In an effort to minimize the risk, Defendant Bank Loan Center (BLC) asked Sunoco to sign an SBA standard form Environmental Indemnification and Remediation Agreement to conform with SBA Standard Operating Procedure No. 50-10(4)(B) subpart A(7)(g)(3).  Sunoco declined.

In December 2003, before the closing, Fawaz learned that BLX was not going to fund the loan.  (Fawaz Dep. at 54).  According to Defendants, they rejected the loan because Sunoco refused to sign the indemnity agreement and because Plaintiffs did not comply with the terms of the commitment letter and/or SBA authorization.  (*See* Pl.'s Resp. Ex. 18).

On December 22, 2003, Fawaz assigned his rights to purchase the Station to New Millennium, Inc.  (Mot. Ex. 8).  New Millennium purchased the Station from Sunoco.[2]  On January 26, 2004, Fawaz entered into a land contract with New Millennium for $725,000 at 3% over prime over 20 years.  (Mot. Ex. 7).  Although Fawaz admits that he did not read the land contract (Fawaz Dep. at 112), he contends that when he signed the land contract, he believed that he would be able to buy the Station from New Millennium for $650,000.  (Fawaz Dep. at 25, 106).

New Millennium was owned by an individual named Hassan Harajli, who also owned Fusion Oil Company, a fuel supply company.  Fusion Oil had previously entered

---

[2] The purchase occurred some time between December 22, 2003 and January 26, 2004.  The record does not indicate the date of sale.

into a ten-year contract with Sunoco to provide the Station with an 80,000 gallon monthly minimum. (Mot. Ex. 16). To get the land contract with New Millennium, Harajli required Fawaz to enter into a twenty-year fuel supply agreement with Fusion Oil at a 90,000 gallon monthly minimum. (Mot. Ex. 17).

**II.   Standard of Review**

This Court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53. It is not enough that the nonmoving party comes forward with the "mere existence of a scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the nonmoving

party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

### III. Applicable Law and Analysis

A. <u>Promissory Estoppel Claim</u>

"The elements of promissory estoppel are (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 686-87, 599 N.W.2d 546, 552 (1999). Plaintiffs have failed to satisfy these elements.

First, promissory estoppel requires "an actual, clear, and definite promise." *Ypsilanti Twp. v. General Motors Corp.*, 201 Mich. App. 128, 134, 506 N.W.2d 556. 559 (1993) (citing *State Bank of Standish v. Curry*, 442 Mich. 76, 84-85, 500 N.W.2d 104, 108 (1993)). "A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *State Bank of Standish*, 442 Mich. at 85, 500 N.W.2d at 108.

In their Brief, Plaintiffs contend that their promissory estoppel claim is based on the following statements that Fitzgerald made to Fawaz: 1) during their first meeting Fawaz contends that after he told Fitzgerald about the underground leak, "[Fitzgerald] said that should be no problem. We deal with Sunoco all the time, and we know about all this stuff. He said it should be no problem at all" (Fawaz Dep. at 58); and 2) at their second

7

meeting, after Fitzgerald gave Fawaz the commitment letter, Fawaz contends that Fitzgerald said, "we're all set, we're all done" (*id.* at 112-13).[3] The Court does not believe that Plaintiffs were justified in perceiving either of these statements to mean that a loan commitment had been made.

Moreover, Michigan courts have held that an integration clause or merger clause generally renders unreasonable a plaintiff's reliance on extra-contractual representations. *See, e.g.*, *Novak*, 235 Mich. App. at 689-90, 599 N.W.2d at 553-54. In this case, the commitment letter contained the following integration clause: "Borrower(s) understands and acknowledges that it may not rely upon any statements or representations made by any party in connection with the loan unless they are contained in this commitment . . . ." (Commitment Letter at 6). Therefore, in light of the written contract, Plaintiffs were unreasonable in their reliance on Fitzgerald's statements.

Consequently, there are no issues of material fact as to whether Defendants promised Plaintiffs they would receive a loan, and whether Plaintiffs reasonably relied on such promise. Therefore, summary judgment shall be granted as to Plaintiffs' Promissory Estoppel Claim (Count I).

B. <u>Unconscionable Contract of Adhesion Claim</u>

In their Motion, Defendants contend that Plaintiffs cannot show that the contract was an unconscionable contract of adhesion. In determining whether a contract is one of

---

[3] At the hearing, however, when asked to identify the promise, Plaintiffs' counsel referred only to Fitzgerald's second statement, which was allegedly made after Fitzgerald delivered the commitment letter.

8

adhesion, the Court must consider the relative bargaining power of the parties, their relative economic strength, and the alternative sources of supply. *Sands Appliance Servs. v. Wilson*, 231 Mich. App. 405, 419, 587 N.W.2d 814, 820 (1998). "[A] contract is an adhesion contract only if the party agrees to the contract because he has no meaningful choice to obtain the desired goods or services elsewhere." *Rembert v. Ryan's Family Steak Houses, Inc.*, 235 Mich. App. 118, 157 n.28, 596 N.W.2d 208, 226 n.28 (1999).

Plaintiffs have failed to come forward with any evidence that they had no meaningful choice to obtain financing from other lending companies. In their Response, Plaintiffs do not even discuss their Count II claim. Therefore, summary judgment shall be granted as to Plaintiffs' Contract of Adhesion Claim (Count II).

C. Innocent Misrepresentation Claim

A claim of innocent misrepresentation is shown where a party "detrimentally relies on a false representation in such a manner that the injury inures to the benefit of the party making the misrepresentation." *Forge v. Smith*, 458 Mich. 198, 211-12, 580 N.W.2d 876, 883 (1998). Unlike a claim for fraud, a person making an innocent misrepresentation need not know that such misrepresentation was false. *Mitchell v. Dahlberg*, 215 Mich. App. 718, 723, 547 N.W.2d 74, 77 (1996). However, "the misrepresentation must relate to a past or existing fact and not be promissory in nature." *Derderian v. Genesys Health Care Sys.*, 263 Mich. App. 364, 381, 689 N.W.2d 145, 157 (2004) (quotation omitted).

First, Plaintiffs have failed to show their injuries "inured to the benefit of" Defendants. *See Forge*, 458 Mich. at 211-12, 580 N.W.2d at 883.

Second, the "misrepresentations," which Plaintiffs contend form the basis of their

9

innocent misrepresentation claim, are the two statements made by Fitzgerald: 1) "that [the underground leak] should be no problem" (Fawaz Dep. at 58); and 2) "we're all set, we're all done" (*id.* at 112-13). However, neither of these statements relate to a past or existing fact. The first statement that the under ground leak ***should be*** no problem is clearly promissory in nature. Moreover, in this Court's opinion, the second statement is too vague to constitute a misrepresentation. It was completely unreasonable for Fawaz to believe that by Fitzgerald's statement, "we're all set, we're all done," which he made when he handed the commitment letter to Fawaz and before Fawaz and his wife even signed the letter, meant that Defendants were unconditionally bound to loan Plaintiffs money. Thus, summary judgment shall be granted as to Plaintiffs' Innocent Misrepresentation Claim (Count III).

    D. Breach of Contract Claims

A court must enforce a contract as written if there is only one possible interpretation. *Morley v. Automobile Club of Michigan*, 458 Mich. 459, 465, 581 N.W.2d 237, 240 (1998). The rights and duties of parties to a contract are derived from the terms of the agreement. *Evans v. Norris*, 6 Mich. 369, 372 (1859).

Defendants contend that they were not obligated to loan Plaintiffs money because Plaintiffs failed to satisfy "conditions precedent." A condition precedent is "a condition that must be met by one party before the other party is obligated to perform . . . ." *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402, 411, 646 N.W.2d 170, 176 (2002).

Specifically, Defendants point to the portions of the commitment letter which required Plaintiffs to meet certain environmental conditions (Commitment Letter at 3).

10

Plaintiffs were also required to obtain an SBA Loan Guaranty (*id.* at 1), which was dependent on the fulfilment of certain environmental requirements. (Pl.'s Resp. Ex. 12, SBA Authorization at 7 ("If Lender or SBA determines from the Environmental Investigation that there is potential environmental contamination, Lender may not disburse the Loan until SBA is satisfied that the risk has been sufficiently minimized.")). The commitment letter also provided that BLX had the right to withdraw the commitment if it uncovered "information that adversely affects the basis upon which this commitment was issued." (Commitment Letter at 4). The Defendants' Loan Report sets forth the "basis" for the commitment and provides, in part: "BLX will require a clean Phase I ESA [Environmental Site Assessment] report." (Defs.' Mot. Ex. 5. Loan Report).

Here, PME's Phase I environmental assessment revealed that there was a leaking underground storage tank. The fact that the Phase I assessment was not "clean" constitutes information that adversely affects the basis upon which the commitment was issued. Therefore, following the Phase I assessment, under the terms of the commitment letter, it was within Defendants' discretion to withdraw the commitment.

Plaintiffs also contend that Defendants breached their implied duties of good faith and fair dealing by waiting too long to inform Plaintiffs that it would not be loaning them money, which deprived them of the opportunity to go elsewhere to get a loan. In support of these claims, Plaintiffs cite to *LaSalle National Leasing Corp. v. Lyndecon, L.L.C.*, 409 F. Supp. 2d 843 (E.D. Mich. 2005). However, *LaSalle* specifically provides that "Michigan does *not* recognize an independent tort action for an alleged breach of a contract's implied covenant of good faith and fair dealing." *LaSalle*, 409 F. Supp. 2d at

11

847 (emphasis added) (citing *Ulrich v. Federal Land Bank*, 192 Mich. App. 194, 197, 480 N.W.2d 910 (1991)).  As this Court noted at the hearing, in breach of contract claims, it is irrelevant whether the party acted in bad faith or dealt unfairly; the issue is whether the party breached the contract.

Consequently, summary judgment shall be granted as to Plaintiffs' Breach of Contract Claim–Implied Duty of Good Faith (Count IV), Breach of Contract Claim–Implied Duty of Fair Dealing (Count V), and Breach of Express Contract Claim (Count VI).

E.  Negligence Claim

To establish negligence, a plaintiff must prove the following elements: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) causation; and (4) damages.  *Schultz v. Consumers Power Co.*, 443 Mich. 445, 449, 506 N.W.2d 175, 177 (1993).  The existence of a legal duty is a question of law.  *Beaudrie v. Henderson*, 465 Mich. 124, 130, 631 N.W.2d 308, 311 (2001).  "While it is true in Michigan that any contractual undertaking is accompanied by a common law duty to use ordinary care in the performance of the task undertaken, a tort action will lie only if a relation exists which would give rise to a legal duty without enforcing the contract promise itself." *Nelson v. Northwestern Savings and Loan Ass'n*, 146 Mich. App. 505, 509, 381 N.W.2d 757, 759 (1986).

In this case, Plaintiffs have failed to show that the Defendants owed Plaintiffs any duty of care outside of the obligations set forth in the commitment letter, which were conditioned upon Plaintiffs' fulfillment of certain conditions precedent.  Therefore,

summary judgment shall be granted as to Plaintiffs' Negligence Claim (Count VII).

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Patrick D. Ball, Esq.
Timothy J. Harrington, Esq.